IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KIVA KITCHEN & BATH, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. H-06-2562 |
| | § | |
| CAPITAL DISTRIBUTING, INC., | § | |
| JOHN MICHAEL DAVIS a/k/a | § | |
| MICHAEL DAVIS a/k/a JOHN | § | |
| DAVIS, and JENNIFER TYRRELL, | § | |
| | § | |
| Defendants/ Third-party | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| BRINGMEBIZ, INC., and TODD | § | |
| MCCALLY, | § | |
| | § | |
| Defendants/Third-party | § | |
| Defendants. | § | |

## ORDER

Pending before the Court are Plaintiff Kiva Kitchen & Bath, Inc.'s Motion for

Assessment of Statutory Damages Under the Anti-Cybersquatting Consumer

Protection Act (Document No. 147); Plaintiff's Motion for Judgment Subject to its

Motion for Assessment of Statutory Damages under the ACPA (Document No. 148);

Defendants' Response to Plaintiff's Motion for Judgment and Motion for Judgment

(Document No. 151); Defendants' Proposed Final Judgment (Document No. 154);

Defendants/Third-Party Defendants BringMeBiz, Inc. and Todd McCally's Motion

for Judgment and Response to Defendants' Motion for Judgment (Document No.

160); and Plaintiff's Brief in Support of Its Bill of Costs (Document No. 162).

Having considered the motions, submissions, and applicable law, the Court

determines that Defendants' motions should be denied, Third-Party Defendants'

motion should be granted, and Plaintiff's motions should be granted in part and

denied in part.

## BACKGROUND

Plaintiff Kiva Kitchen & Bath, Inc. ("Kiva") seeks entry of judgment pursuant

to a jury verdict in its favor that found Defendants Capital Distributing, Inc.

("Capital") and John Michael Davis ("Davis") (collectively, "Defendants") violated

the Lanham Act, 15 U.S.C. §§ 1051-1141, and Texas common law for trademark

infringement. Specifically, on February 6, 2008, the jury found Defendants infringed

on one Kiva trade name in violation of 15 U.S.C. § 1125(a), unlawfully registered

Kiva's trade names on the internet in violation of the Anti-Cybersquatting Consumer

Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and unlawfully engaged in unfair

competition, in violation of Texas common law.

Kiva owns appliance stores that sell high-end kitchen appliances in various

2

Texas cities, specifically, AABC Appliance Gallery in Houston ("AABC"); Jarrell Appliance Gallery in Dallas ("Jarrell"); Stone Appliance Gallery in San Antonio ("Stone"); and McNairs Appliance Gallery in Austin ("McNairs"). Kiva began purchasing the stores, established as far back as 1939, in the 1990's, paying for each store's name and goodwill and operating each store under its original name.

In December 2005, Davis, on behalf of Capital, a Dallas appliance store, began registering domain names that incorporated the names of, or similar spellings of, numerous competitor appliance stores, including Kiva's appliance stores in the various cities.[1] Moreover, Davis forwarded the Jarrell names, Defendants' direct competitor in the Dallas market, to Capital's website, www.capitaldistributing.com ("Capital website").[2] On August 2, 2006, Kiva brought this suit, alleging Defendants infringed Kiva's trademarks and trade names.

In response, Defendants filed claims against Third-Party Defendants BringMeBiz, Inc. ("BringMeBiz"), a search engine optimization company, and Todd McCally ("McCally") (collectively, "Third-Party Defendants"), its owner. During the

---

[1]Capital registered eight infringing domain names: jarrellappliancegallery.com, jarrellappliance.com, jarrellgallery.com, (collectively, "Jarrell names"), and aabcappliancegallery.com, stoneappliancegallery.com, mcnairappliance.com, mcnairsappliance.com, and mcnairappliancegallery.com (collectively, "domain names").

[2]Although Davis forwarded the Jarrell names to the Capital website, he did not forward the five remaining Kiva trade names.

relevant time period, Defendants had hired McCally to optimize the Capital website. Davis, asserting McCally advised him it was not illegal to register and forward the domain names of his competitors, filed suit against the Third-Party Defendants for, *inter alia*, breach of contract and negligent misrepresentation.[3]

The Court held a six-day jury trial from January 29, 2008 until February 6, 2008. Kiva presented the jury with two theories of recovery: 1) two violations of the Lanham Act, and 2) unfair competition under Texas common law, with one question regarding actual damages for three causes of action.  The jury found Capital and Davis liable for all three causes of action and awarded Kiva compensatory damages in the amount of $257,232.[4]  The jury also determined the case was an exceptional case, and awarded punitive damages in the amount of $200,000, finding Davis acted with malice or gross negligence.  Finally, the jury found the Third-Party Defendants are not liable to Defendants.  Kiva and Third-Party Defendants ask the Court to enter judgment based upon the jury verdict against Defendants, awarding damages to Kiva and a take-nothing judgment in favor of Third-Party Defendants.

------

[3]Although Kiva subsequently asserted claims against the Third-Party Defendants, it non-suited those claims and dismissed Defendant Jennifer Tyrrell from the suit.  Moreover, during the course of the litigation and trial, Kiva abandoned numerous causes of action.

[4]Specifically, the jury found Capital and Davis' use of the Jarrell name constituted trademark infringement and unfair competition, and Davis and Capital each violated the ACPA by registering each of the eight domain names with a bad faith intent to profit.

4

Specifically, Kiva seeks: 1) either the jury award of compensatory damages for trademark infringement or the Court's assessment of statutory damages under the ACPA, whichever is greater; 2) transfer of the domain names to Kiva; 3) attorneys' fees based upon the jury's finding that the case is an exceptional case; 4) costs; 5) a permanent injunction enjoining Defendants from infringing on or using Kiva's trade names; 6) pre- and post-judgment interest; and 7) the jury award of punitive damages based upon Defendants' violation of Texas state law prohibiting unfair competition.[5]

---

[5]At the outset, the Court does not find Kiva is entitled to punitive damages based upon the election of remedies doctrine. Kiva concedes trademark infringement under the Lanham Act and unfair competition under Texas common law share the same elements. Under Texas law, a party who submits numerous theories of liability to the jury, and who obtains findings of liability on two or more of those theories, is entitled to only a single recovery. *Quest Med. Inc. v. Apprill*, 90 F.3d 1080, 1093 (5th Cir. 1996). If a party fails to elect prior to entry of judgment under which theory he seeks to recover, the trial court must enter judgment under the theory that affords the party the greatest recovery. *Id.* In this case, Kiva submitted two theories of liability to the jury: violations of the Lanham Act and a violation of Texas common law. An election of remedies is appropriate under Texas law because to allow Kiva to receive both punitive damages for unfair competition and compensatory or statutory damages for violations of the Lanham Act would constitute impermissible picking and choosing among damage elements arising under different theories of recovery. *See Am. Rice, Inc. v. Producers Rice Mill, Inc.*, --- F.3d --- , 2008 WL 467153, at *8 (5th Cir. Feb. 22, 2008); *Quest Med. Inc.* 90 F.3d at 1094 (explaining a plaintiff cannot cut and paste elements of relief arising from different theories of recovery). Although other courts have allowed a punitive damage award for a violation of state common law unfair competition that mirrors Lanham Act causes of action, the United States Court of Appeals for the Fifth Circuit affirmed a district court's application of an election of remedies under Texas law. *Am. Rice, Inc.*, 2008 WL 467153, at *2, 13 (finding that, pursuant to the election of remedies, a prevailing plaintiff was not entitled to attorneys' fees under the Lanham Act because the case was not exceptional and was not entitled to attorneys' fees for breach of a settlement agreement under Texas law because the plaintiff received its damage award under the Lanham Act); *cf. JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 919 (7th Cir. 2007) (finding

Moreover, Third-Party Defendants seek entry of judgment in their favor that they are not liable to Kiva or Defendants.[6]

Despite the jury's verdict finding Defendants are liable to Kiva, Defendants ask the Court to disregard the jury verdict and enter judgment that Third-Party Defendants are liable to Defendants, Defendants have no liability or reduced liability to Plaintiff or, alternatively, that Third-Party Defendants are liable for Kiva's damages.[7] Because the Court finds substantial evidence to support the jury's verdict, the Court must determine the remedies to which Kiva is entitled.

---

that punitive damages under state law unfair competition is not preempted by the Lanham Act because Congress would have acted more clearly if it had intended to displace state punitive damage remedies). Accordingly, the Court is not persuaded Kiva is entitled to a punitive damage award under Texas law prohibiting unfair competition when Kiva is recovering statutory damages under the Lanham Act. *See Am. Rice, Inc.*, 2008 WL 467153, at *13. Thus, the Court addresses the remaining damages Kiva seeks.

[6]Because the Court finds substantial evidence to support the jury's finding that Third-Party Defendants have no liability to Defendants, the Court enters judgment in favor of the Third-Party Defendants regarding Defendants' breach of contract and negligent misrepresentation allegations against them.

[7]Although Defendants' response to Plaintiff's motions for entry of judgment is not styled as a motion for judgment as a matter of law, Defendants's response essentially seeks to nullify the jury's findings. Defendants aver the jury's damage award should have been about fifty percent less and/or there is insufficient evidence to support the jury's verdict. Because the Court finds substantial evidence to support the jury's verdict, the Court addresses the damages to which Kiva is entitled based upon the jury verdict and the Court's independent findings based upon the evidence.

## LAW AND ANALYSIS

### I. STATUTORY DAMAGES

Relying on 15 U.S.C. § 1117(a) ("§ 1117") regarding damages for trademark infringement, Kiva seeks the jury's award of compensatory damages for trademark infringement or the Court's assessment of statutory damages under the ACPA, whichever is greater.[8] Kiva requests the maximum statutory damages in the amount of $800,000, that is, $100,000 for each of the eight infringing domain names Davis registered. In response, Defendants argue they violated the ACPA by registering "at most" only one Kiva name and assert maximum statutory damages are not warranted because Defendants' conduct is not egregious. Defendants ask the Court to enter a

---

[8]Kiva requests the Court enhance the jury's compensatory damage award, arguing it is inadequate because Capital allowed its website-hosting company to destroy log files that would have demonstrated the amount of website traffic being directed to Capital's website. Furthermore, Capital refused to provide customer and sales records to Kiva, depriving Kiva of the ability to apportion Capital's gross sales between infringing and non-infringing sales. A district court has substantial discretion in awarding damages under § 1117 but may not assess a punitive or inequitable award. *See Dial One of the Mid-South, Inc. v. BellSouth Telecomms.,* 401 F.3d 603, 609 (5th Cir. 2005). Because the jury heard evidence regarding the uncertainty of proving Defendants' profits, log files being destroyed, and Capital's failure to provide records, the Court declines to enhance the actual damage award found by the jury. *See id.* (affirming a district court's damage award because the court took into account, *inter alia,* the speculative nature of future profits and weighed factors sufficient to support the award); *see also Neles-Jamesbury, Inc. v. Bill's Valves,* 974 F. Supp. 979, 983 (S.D. Tex. 1997) (declining to enhance a jury's damage award because the court did not find evidence of damages that the jury did not include in its verdict). Because the Court awards statutory damages that are greater than the compensatory damages awarded by the jury, the Court analyzes only Kiva's request for statutory damages.

take-nothing judgment or a reduced judgment against them.

The Lanham Act was intended to make "actionable the deceptive and misleading use of marks and to protect persons engaged in commerce against unfair competition. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992). As an amendment to the Lanham Act, Congress passed the ACPA in 1999 "to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad–faith and abusive registration of distinctive marks as internet domain names with the intent to profit from the goodwill associated with such marks-a practice commonly referred to as 'cybersquatting.'" *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir. 2000); *see also Green v. Fornario*, 486 F.3d 100, 103 (3d Cir. 2007) (explaining the Lanham Act not only regulates trademark infringement, but also creates civil liability for, *inter alia*, cybersquatting); *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003).

Codified in 15 U.S.C. § 1125(d), the ACPA makes it illegal for a person to register or to use with a bad faith intent to profit an internet domain name that is identical or confusingly similar to the distinctive trade name or internet domain name

8

of another person or company.[9] *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). Under the ACPA, "the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." § 1117(d). Thus, successful plaintiffs may recover statutory damages in an amount assessed at the district court's discretion from $1,000 to $100,000 per domain name. *Id.* The imposition of statutory damages in cybersquatting cases serves to deter wrongful conduct and to provide adequate remedies for trademark owners who seek to enforce their rights in court. *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 432 (M.D.N.C. 2003); *E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1048 (S.D. Tex. 2001) (the

---

[9]The ACPA also contains a safe harbor for those whom a court determines had reasonable grounds to believe that the use of the domain name was a "fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii) (2006). The safe harbor is only available when a defendant both believed and had reasonable grounds to believe the use of the domain name was fair use or otherwise lawful. *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001). A defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the ACPA's safe harbor provision. *Id.* Davis conceded at trial that he registered and forwarded the domain names to get customers to shop with him. Although Davis argued at trial he believed he could lawfully register the domain name because McCally allegedly advised Davis it was not unlawful to register them, the jury determined Third-Party Defendants are not liable to Defendants, and Davis registered Kiva's names with a bad faith intent to profit. Based on this evidence, the Court finds Defendants may not benefit from the ACPA's safe harbor provision. *See Virtual Works, Inc.*, 238 F.3d at 269 (finding that a defendant that openly admitted hope of profiting from consumer confusion of an infringing domain name was not, as a matter of law, entitled to benefit from the safe harbor provision).

9

statutory damages rule not only merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct).  Accordingly, the Court must determine, in its discretion, an appropriate statutory damage award.  *See Shields*, 254 F.3d at 481.

The evidence at trial established Davis opened two accounts at Network Solutions, Inc. to register numerous domain names that were variations of, or similar to, the names of his competitors.  In December 2005, Davis opened an account under the name Michael Davis and registered numerous competitors' names as domain names, including some of Kiva's appliance store names and national companies' appliance store names, such as the names of appliance stores owned by Sears and Home Depot.  In February 2006, Davis opened another account under the name John Davis and registered, *inter alia*, five more Kiva names.[10]

When he registered the names of competitor websites, Davis chose the web forwarding and private registration options for domain names similar to his competitors.[11]  Davis conceded he forwarded the three Jarrell domain names to

---

[10]Davis testified he opened the Michael Davis account in December 2005 from the office, but he opened another account under a different name in February 2006 because he was at home and did not have his log in and password for the first account.  However, contrary to this testimony, the evidence at trial established Davis used the same computer to open both the December 2005 and February 2006 accounts.

[11]Under the private registration option, the domain names were listed without any contact information, including the registrant's address, email, or phone number.

Capital's website from December 2005 and/or February 2006 until July 2006. He testified he registered and forwarded competitors' names so the competitors could not use the names and because he wanted people to shop with him.

Davis agreed that the impetus to stop forwarding the Jarrell names to the Capital website came about in early July 2006 based upon a conversation between Davis' daughter, Jennifer Tyrrell ("Tyrrell"), Capital's marketing manager, and Westye appliance representatives, all of whom were setting up a live kitchen demonstration in downtown Dallas. One of the Westye representatives asked Tyrrell if she knew that Kiva's trade name was being forwarded to Capital's website. Davis testified that when Tyrrell told him about the conversation, he felt embarrassed that he was doing something that "didn't reek of integrity." Davis testified his actions regarding registering and forwarding Kiva's domain names were made in "a moment of weakness of losing my moral compass." Davis changed the forwarding of Kiva's names from Capital's website to the Dallas Morning News website. Davis testified that all but one of Kiva's names had been conveyed to Kiva shortly before trial.

Moreover, evidence at trial established that Capital's website contained hidden text of competitors' names up to and including the days of trial.[12] Kiva's expert

---

[12]Hidden text enables internet search engines, but not persons viewing the web page, to detect the hidden terms and increase the chances the web page would be reported in the search engine's results page that is viewed by the public. *See Playboy Enters., Inc. v. Calvin*

testified that placing hidden text on a website is deceptive because it displays one text to the end user and one text to the search engines.[13]   Additionally, Davis testified he created the phrase "a great indoor builder factory appliance gallery expo offering gold star service" as a description tag so that a search engine would place Capital's website higher in its results page.   Davis conceded at trial he used this description tag, that compiles five competitors' names, so that when customers use a search engine to find a competitor, they would find Capital's website, not the competitors' website. However, Davis agreed that using other people's trade names to get folks to his business was not an ethical thing to do.[14]

The jury returned its verdict and determined Defendants' registration and use of eight marks substantially similar to Kiva's marks violated the ACPA.   Although Kiva now seeks the maximum statutory damages for each of the eight infringing domain names, the Court finds it appropriate to differentiate between the three Jarrell

---

*Designer Label*, No. Civ. A. C-97-3204, 1999 WL 329058, at *3 (N.D. Cal. May 7, 1999).

[13]Davis testified it was a mystery to him how the competitors' hidden names appeared on his website.

[14]At trial, Davis defended his actions by alleging he asked McCally, who was helping Capital optimize its website, if he could register and forward domain names of his competitors to his website.   Davis testified McCally told him he could lawfully register and forward competitors' names.   In opposition, McCally testified Davis never discussed forwarding competitors' domain names to Capital's website, and he did not tell Davis he could forward such domain names.

12

names and the remaining five domain names.

With respect to the Jarrell names, several factors suggest a maximum statutory damage award for each of the three names. First, Davis, on behalf of Capital, a Dallas-based business, registered the Jarrell names knowing Kiva's Dallas store, Jarrell Appliance Gallery, is in direct competition with Capital in the Dallas market. *See Aztar Corp. v. MGM Casino*, No. 00-833-A, 2001 WL 939070, at *5-6 (E.D. Va. Apr. 9, 2001) (awarding statutory damages in the amount of $100,000 when, *inter alia*, the defendant's domain name incorporated the plaintiff's mark in its entirety, led to a web site that provided services identical to those of the plaintiff, and defendant had a bad faith intent to deceive internet consumers).

Moreover, Davis testified his intent was to divert customers from Kiva's website to Capital's website because he wanted people to shop with him and because he did not want Kiva to have access to its names. *See Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 513-14 (E.D. Va. 2003) (awarding plaintiff, the Graduate Management Admission Test ("GMAT") owner, statutory damages in the amount of $100,000 for defendant's use of GMAT's domain names with intent to divert students from legitimate GMAT websites to defendant's website).

Furthermore, although the suit was filed in August 2006, Defendants refused to stop forwarding the infringing domain names or to transfer them to Kiva for more

than a year, and did so a few weeks before trial. *See Bellagio v. Denhammer*, No. CV-S-00-1475-RLH-PAL, 2001 WL 34036599, at *4 (D. Nev. July 10, 2001) (awarding plaintiff statutory damages in the amount of $100,000 because of the defendants' conduct in first refusing to transfer ownership of an infringing domain name to plaintiff and subsequently transferring its ownership to a foreign individual). In this case, the Court finds that $100,000 per Jarrell domain name, for a total of $300,000, is reasonable to provide an adequate remedy for Defendants' ACPA violations and deter wrongful conduct. *See Pinehurst, Inc.*, 256 F. Supp. 2d at 432.

Next, the Court must determine an appropriate award for Defendants' registering the remaining five domain names of Kiva's stores in other Texas cities. The Court notes Davis freely uses his direct competitors' names in Capital's web pages and registers competitors' names as domain names in order to keep his competitors from registering them. Davis concedes his actions lacked integrity, yet even though Kiva filed suit, he refused to return the infringing domain names to Kiva until trial was imminent. However, mitigating against a maximum damage award, the Court notes Defendants do not directly compete with Kiva in these other markets, and Kiva concedes much of its business comes from builders in the area. Moreover, neither party sells appliances on the internet but uses its web sites to attract customers and provide information regarding appliances.

14

On the other hand, a domain name mirroring a corporate name may be a valuable corporate asset, as it facilitates communication with a customer base. *See E. & J. Gallo Winery,* 129 F. Supp. 2d at 1048 (citing *Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1327 (9th Cir. 1998)); *see also Pinehurst, Inc.,* 256 F. Supp. 2d at 431 (explaining a defendants' use of the plaintiff's domain names reduced plaintiff's control over its unique association with its marks and prevented plaintiff's ability to engage in electronic commerce under its trade names, reducing the selling power of plaintiff's marks); *Panavision Int'l, L.P.,* 141 F.3d at 1327 (explaining that customers searching for a company's website often search using a domain name identical or similar to the company's name or mark, and defendant's use of plaintiff's mark may cause customers who cannot locate plaintiff's website to stop searching).

Based upon the circumstances of this case, the Court finds $40,000 per domain name, for a total of $200,000 for the five domain names, is reasonable and serves the purpose of deterring wrongful conduct and compensating Kiva. *See PetMed Exp., Inc. v. MedPets.Com, Inc.,* 336 F. Supp. 2d 1213, 1222 (S.D. Fla. 2004) (awarding statutory damages under the ACPA in the amount of $50,000 per infringing domain name); *Pinehurst, Inc.,* 256 F. Supp. 2d at 433 (awarding plaintiff statutory damages in the amount of $50,000 per domain name); *E. & J. Gallo Winery,* 129 F. Supp. 2d at 1048 (awarding plaintiff statutory damages in the amount of $25,000 per domain

15

name).  In sum, the Court finds a statutory damage award of $300,000 for the Jarrell domain names and $200,000 for the remaining five domain names, for a total statutory damage award of $500,000, is reasonable to compensate Kiva for Defendants' violations of the ACPA.  *See Shields*, 254 F.3d at 481.

## II. TRANSFER OF DOMAIN NAMES

Kiva asks the Court to require Defendants to transfer the infringing domain names to Kiva.  In response, Defendants assert the domain names have already been transferred to Kiva.  Thus, the Court must determine whether transfer is warranted.

The ACPA provides that "a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." *Sporty's Farm L.L.C.*, 202 F.3d at 496 (quoting 15 U.S.C. § 1125(d)(1)(C)); *see also E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 275 (5th Cir. 2002).  As of the time of trial, the parties testified Defendants had transferred all but one of Kiva's trade names to Kiva.  Defendants aver they have now transferred the infringing domain names to Kiva.  However, because there is insufficient evidence that establishes all the infringing names have been transferred, and Kiva is successful in its ACPA claims, the Court grants Kiva's request.  To the extent they have not already done so, Defendants shall transfer the eight infringing domain names to Kiva.  *See Sporty's Farm L.L.C.*, 202 F.3d at 496.

16

## III. ATTORNEYS' FEES

Plaintiff requests attorneys' fees under the ACPA based upon the jury's finding that the case is exceptional. Kiva seeks attorneys' fees in the amount of $711,930.50 and contingent fees in the amount of $200,000.[15] In response, Defendants contend the case is not exceptional, and Kiva's request for attorneys' fees is not reasonable.

The Lanham Act provides that a court may award attorneys' fees to the prevailing party in exceptional cases. *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distribution Co., Inc.*, --- F.3d ---, 2008 WL 588640, at *7 (5th Cir. Mar. 5, 2008) (citing 15 U.S.C. § 1117(a)); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006); *Shields*, 254 F.3d at 487. The prevailing party has the burden to demonstrate the exceptional nature of the case by clear and convincing evidence. *Schlotzsky's, Ltd.*, 2008 WL 588640, at *7. A case is exceptional if a defendant's conduct involves acts that can be called "malicious," "fraudulent," "deliberate," or "willful." *Id.*

In this case, the jury determined, and the Court agrees, Kiva demonstrated by clear and convincing evidence that the case was an exceptional case because

---

[15]Kiva's original motion for entry of judgment requested attorneys' fees in the amount of $689,115, which did not include fees for February 2008. However, Kiva supplemented its request on April 1, 2008 and included invoices for fees billed through February 25, 2008.

17

Defendants acted willfully, maliciously, fraudulently, or deliberately.[16]   Davis intentionally registered the domain names of his competitors in order to prevent them from using domain names associated with their trade names. Davis testified that he felt he had lost his moral compass and felt his actions did not "reek of integrity." However, Davis did not return the domain names to Kiva until the eve of trial. Davis also kept the competitors' names private when he registered them in order to prevent others from contacting him regarding these domain names. Moreover, Davis forwarded some of Kiva's names to Capital's website and to other websites in order to get customers to shop with Capital not with Kiva. The Court finds the case is an exceptional case because Davis deliberately registered Kiva names as domain names, and thus, Kiva is entitled to its reasonable attorneys' fees. *See Schlotzsky's, Ltd., Inc.*, 2008 WL 588640, at *7; *Audi AG*, 469 F.3d at 551 (explaining that even if a defendant changes a website before a suit is filed, he is not absolved from liability under the ACPA (citing *Shields*, 254 F.3d at 486-87)). Accordingly, the Court must determine whether Kiva seeks reasonable attorneys' fees.

---

[16]The jury determined Davis and Capital registered all eight infringing names with a bad faith intent to profit, considering the nine factors articulated in the ACPA to determine whether a cybersquatter registers domain names in bad faith. *See* 15 U.S.C. § 1125(d)(1)(B) (2006); *Virtual Works, Inc.*, 238 F.3d at 268.

## A. Lodestar Calculation

To determine the amount of attorneys' fees to be awarded, the Fifth Circuit utilizes a two-step process called the lodestar method. *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323-24 (5th Cir. 1995). Under this method, a court first determines the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating attorneys. *Id.* at 324. Then, the Court must determine a lodestar by multiplying the reasonable hours by the reasonable hourly rates. *Id.* (citing *Blum v. Stenson*, 465 U.S. 886, 888 (1984)).

There is a strong presumption of the reasonableness of the lodestar amount. *Saizan v. Delta Concrete Prods. Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006). After calculating the lodestar, the court may adjust the lodestar amount upward or downward based upon its analysis of twelve factors enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).[17] *Id.* Of the *Johnson* factors, a court should especially consider the time and labor involved, the

---

[17]The *Johnson* factors are: 1) the time and labor required to represent the client; 2) the novelty and difficulty of the issues in the case; 3) the skill required to perform the legal services properly; 4) the preclusion of other employment by the attorney; 5) the customary fee charged for those services in the relevant community; 6) whether the fee is fixed or contingent; 7) the time limitations imposed by the client or circumstances; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorney; 10) the undesirability of the case; 11) the nature and length of the professional relationship with the client; and 12) awards in similar cases. *See Saizan*, 448 F.3d at 800 n.18.

customary fee, the amount involved and the result obtained, and the experience, reputation, and ability of counsel. *Id.* The lodestar may not be adjusted due to a *Johnson* factor if the creation of the lodestar amount already took that factor into account. *Id.* The most critical factor in determining an attorneys' fee award is the degree of success obtained. *Id.* at 799.

### 1. Hourly Rate

In setting a reasonable billing rate, courts are directed to consider the attorneys' regular rates as well as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 896 n.11; *Kellstrom*, 50 F.3d at 328. Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there. *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002). Similarly, applicants may support an hourly rate by establishing "rates actually billed and paid in similar lawsuits." *See Deltatech Constr., LLC v. The Sherwin-Williams Co.*, No. Civ. A. 04-2890, 2005 WL 3542906, at *3 (E.D. La. Nov. 3, 2005).

Kiva avers seven partners, five associates, seven paralegals, one law clerk, and one paralegal assistant, or a total of twenty-one employees at the law firm, worked on the case. The partners' billing rates range from $375 per hour to $500 per hour; the associates' billing rates range from $200 per hour to $275 per hour; the paralegals'

20

billing rates range from $140 per hour to $175 per hour; the law clerk's billing rate is $135 per hour; and the paralegal assistant's billing rate varied from $165 per hour in 2007 to $75 per hour in 2008.[18]

In support of its fee request, David Burgert ("Burgert"), attorney in charge for Kiva, submitted an affidavit declaring "these rates are reasonable and consistent with the charges of other attorneys, law clerks, and paralegals in Houston, Texas who have similar experience and skill in handling similar lawsuits." Kiva does not provide affidavits from other attorneys opining that the billed rates are reasonable and does not provide evidence that either their law firm or other law firms in other cases charged and obtained the rates billed.[19] *See id.* (explaining that satisfactory evidence of the reasonableness of a requested rate requires more than the affidavit of the attorney performing the work). However, Defendants do not challenge the hourly rates charged.

---

[18]Interestingly, the paralegal assistant's rate is higher in 2007 than in 2008.

[19]Kiva supports the rates charged by including the *Laffey* Matrix, which is an "official statement of market-supported reasonable attorney fee rates" for Washington, D.C. *See Communities for Equity v. Mich. High School Athletic Ass'n.*, No. 1:98-CV-479, 2008 WL 906031, at *11 (W.D. Mich. Mar. 31, 2008) (explaining that courts have relied on the *Laffey* Matrix as evidence of reasonable rates for attorneys in Washington, D.C. for two decades); *see also Smith v. Dist. of Columbia*, 466 F. Supp. 2d 151, 156 (D.D.C. 2006) (explaining there are two different versions of the *Laffey* Matrix). However, Kiva does not cite any Fifth Circuit cases relying on the *Laffey* Matrix, and the Court is not persuaded that the prevailing rates in Washington, D.C. are the prevailing rates in Houston.

Burgert's billable rate was $425 per hour in 2006; $445 per hour in 2007; and $500 in 2008.[20] Burgert presented a skilled, competent, and well-executed trial in this case and successfully represented his client, prevailing on all issues presented to the jury. Based on reasonable rates in the Houston legal community for legal services by attorneys with the level of Burgert's ability, competence, twenty-five years of experience, and skill in the field of intellectual property, the Court finds a rate of $450 per hour is reasonable. *See Sanitec Indus., Inc. v. Micro-Waste Corp.*, Civ. A. No. H-04-3066, 2007 WL 677300, at *2 (S.D. Tex. Mar. 1, 2007) (finding a range from $290 to $495 for partners is comparable in the Houston area). Additionally, the Court finds a rate of $340 per hour is reasonable for three attorneys who have ten to fifteen years experiences.[21] *See id.*

Adam Pogach ("Pogach"), a fourth year associate, was the primary associate working on the case and co-chaired the trial.[22] The Court finds a billing rate for Pogach of $250 per hour is reasonable. *See Firth v. Don McGill of W. Houston, Ltd.*,

---

[20]Kiva provides the Court with varied billing rates for some persons based upon the rates charged in 2006, 2007, and 2008. However, the case spanned approximately fifteen months, and the Court, in its discretion, applies one billing rate for each person who worked on the case.

[21]The three attorneys' billing rates ranged from $340 per hour to $375 per hour.

[22]Pogach worked 1,208.75 hours on the case and billed his time at $235 per hour for 2006; $255 per hour for 2007; and $275 per hour for 2008.

No. Civ. A. H-04-0659, 2006 WL 846377, at *6 (S.D. Tex. Mar. 28, 2006) (awarding $250 an hour for an associate who co-chaired the trial). Peter Irot, Susan Cates, Lindsey Cowart, and Blake Runions, associates with less than three years experience, billed their hours at rates ranging from $215 per hour to $235 per hour. The Court finds a billing rate of $215 per associate, based upon his or her experience, is generally reasonable in the Houston market. *See Sanitec Indus., Inc.*, 2007 WL 677300, at *2 (finding rates between $170 to $215 for associates is comparable to associate rates charged in the Houston area).

Kiva avers seven paralegals, whose billing rates varied between $140 per hour to $175 per hour in 2006 and 2007, worked on the case.[23] Moreover, Kiva seeks rates between $75 per hour to $165 per hour for a paralegal assistant. Finally, Kiva seeks an hourly billing rate of $135 per hour for a law clerk who worked on the case.

The Court notes Kiva does not explain the background or experience of this support staff. Moreover, although Burgert explains two paralegals prepared motions and pleadings, and the law clerk performed legal research, he does not indicate what work the other paralegals performed or whether any of them performed work traditionally done by an attorney. *See Hooker v. Constellation Homebuilder Sys.,*

---

[23]Five paralegals performed fewer than six hours on the case; one paralegal performed thirty-six hours, and one paralegal, Clyde Williams, did the majority of the paralegal work, billing 435.25 hours.

23

*Inc.*, Civ. A. No. V-06-77, 2008 WL 819065, at *5 (S.D. Tex. Mar. 24, 2008) (explaining that plaintiffs are entitled to collect on paralegal time to the extent a paralegal performs work traditionally done by an attorney); *Turner v. Oxford Mgmt. Servs., Inc.*, Civ. A. No. H-06-2178, 2008 WL 818335, at *2 n.5 (S.D. Tex. Mar. 24, 2008) (explaining that hours worked by attorneys and staff may be compensated at reduced rates for "purely clerical or secretarial tasks" and for paralegal work).  Thus, the Court applies a slightly reduced rate for the support staff personnel.

Based upon the Court's review of the prevailing market rates, the Court finds reasonable billing rates are $110 for paralegals, $100 per hour for the law clerk, and $90 per hour for the paralegal assistant.  *See Jones v. White*, Civ. A. No. H-03-2286, 2007 WL 2427976, at *3 (S.D. Tex. Aug. 22, 2007) (finding hourly rates for law clerks between $90 to $135 are reasonable); *Sanitec Indus., Inc.*, 2007 WL 677300, at *2 (finding rates between $90 to $130 for legal assistants is comparable to those rates charged in the Houston area); *Firth*, 2006 WL 846377, at *6 (finding paralegals hourly rates of $95 per hour and $125 per hour are reasonable).

### 2. *Hours Expended*

The party seeking attorneys' fees must present adequately documented time records to the Court.  *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993).  A court should then exclude all time that is excessive, duplicative, or inadequately

24

documented. *Id.* If the documentation is vague or incomplete, a court may reduce the hours. *Kellstrom*, 50 F.3d at 324. Moreover, plaintiffs seeking attorneys' fees are charged with proving they exercised billing judgment. *Saizan*, 448 F.3d at 799; *see also Walker v. City of Mesquite, Tex*, 313 F.3d 246, 251 (5th Cir. 2002). Billing judgment requires documentation of the hours charged and of hours not charged because they were unproductive, excessive, or redundant. *Saizan*, 448 F.3d at 799. If a plaintiff fails to exercise billing judgment, a court does not deny the applicant's fee request but reduces the fee award by a percentage intended to substitute for the exercise of billing judgment. *Id.*

Kiva provides copies of its monthly billing records and avers the hours spent in the litigation were reasonable and necessary. Kiva does not aver it exercised billing judgment but simply presents the Court with an hourly summary of the billing information contained in its invoices. In response, Defendants argue Kiva did not reduce its fee request for time spent in the prosecution of Jennifer Tyrrell, BringMeBiz, or Todd McCally who were dismissed from the case. Next, Defendants contend the case is a simple case, and Kiva's fee request is excessive based only upon "cross-examining Defendant Michael Davis and having their expert testify as to our gross sales figures." Defendants argue the fees should "bear some semblance to the value of the case," comparing the jury's award in the amount of $257,623 in damages

25

and the fees Kiva seeks in the amount of $700,000. Defendants cites as examples that Kiva's rates are excessive: fourteen hours to review Defendants' pleadings and file an amended complaint; twenty-five hours to file a motion to compel; thirty hours to prepare a response to a motion to compel when the issues had already been presented in court; and 180 hours to prepare a joint pretrial order "most of which was simply a boilerplate charge which was not used to any great degree to this case."

The Court disagrees with Defendants' characterization of the joint pretrial order as being "a boilerplate charge which was not used to any great degree in this case."[24] Kiva pursued twelve causes of action against Defendants and Third-Party Defendants and prevailed on the three causes of action submitted to the jury. Moreover, Kiva's claims against Third-Party Defendants were based upon Defendants' cross-claim against the Third-Party Defendants. Although Defendants argue Kiva did not reduce its fee request for time spent prosecuting Tyrrell and Third-Party Defendants, Kiva did not non-suit its claims against these parties until the day before the case went to the jury based upon the evidence at trial. If Defendants had set forth sufficient evidence at trial tending to prove the Third-Party Defendants were liable to Defendants, Kiva would most likely have put its claims against the Third-

---

[24]Pursuant to the local rules, Kiva submitted a seventy-five page joint pre-trial order with more than 250 additional pages of required or discretionary motions and exhibits. *See* S.D. TEX. LOCAL R. 16.2.

Party Defendants to the jury. Based upon these circumstances, the Court declines to reduce Kiva's hours based upon the claims asserted against Jennifer Tyrrell and the Third-Party Defendants.

However, there is no indication Kiva voluntarily exercised billing judgment by reducing hours that were unproductive, excessive, or redundant. In support of its hourly fee request, Kiva points out that its fees comport with a report published by the American Intellectual Property Law Association ("AIPLA"). The AIPLA report indicates the median cost through trial in Texas of a trademark infringement case with $1-25 million at risk is $725,000. Although Kiva contends its case generated fees of $711,000, the AIPLA report is not a substitute for Kiva's burden to exercise billing judgment and to charge rates appropriate for the Houston market. Kiva is not entitled to all hours billed because Kiva failed to exercise billing judgment by reducing hours that were unproductive, excessive, or redundant. *See Saizan*, 448 F.3d at 799.

Moreover, Kiva fails to summarize what tasks were performed by the twenty-one persons who worked on the case for the past fifteen months in order for the Court to determine whether the tasks performed could have been done by other persons with a lower billing rate. *See Leroy v. City of Houston*, 906 F.2d 1068, 1079 (5th Cir. 1990) (explaining that hourly rates for attorneys may be inappropriate if a task could have been performed with greater cost efficiency by competent personnel at lower

27

rates).   Exercising billing judgment based upon the records before the Court, the
Court reduces the total number of hours billed by twenty-five percent.  *See Saizan*,
448 F.3d at 799.

Finally, Defendants contend  it was unnecessary for Kiva to have two attorneys
present at four out of five depositions.   Although the Court does not agree with
Defendants that Kiva's allowing two attorneys to attend depositions and hearings is
unnecessary or excessive, the Court finds twenty-one persons working on the case is
excessive.  *See Leroy*, 906 F.2d at 1079 (explaining that hours, though actually
expended but which result from the case being overstaffed, are not hours reasonably
expended and must be excluded from the fee calculation).  The Court is not persuaded
that Kiva did not duplicate work that could have been accomplished by fewer
persons.   For example, Kiva submits hours billed by four attorneys and four
paralegals who billed less than one hour.[25]  Kiva does not explain why the tasks given
to these persons could not have been accomplished more expeditiously by persons in
comparable positions who had more background and knowledge about the case.  *See
id.*  Thus, the Court eliminates the time expended by attorneys and paralegals who
spent less than one hour on the case as excessive.

---

[25]Although two paralegals expended one hour on the case, the time credited for these
two paralegals is less than one hour with the twenty-five percent billing judgment reduction.

In sum, the Court calculates Kiva's lodestar as:

| Personnel | Hourly Rate | Time | Total |
|---|---|---|---|
| David Burgert | $450 | 388.87 | $174,991.50 |
| Eric Wade | 340 | 6.37 | 4,165.80 |
| Susan Hellinger | 340 | 51.93 | 17,656.20 |
| Adam Pogach | 250 | 906.56 | 226,640.00 |
| Susan Cates | 215 | 9.56 | 2,055.40 |
| Lindsay Cowart | 215 | 42.93 | 9,229.95 |
| Peter Irot | 215 | 77.43 | 16,647.45 |
| Blake Runions | 215 | 37.31 | 8,021.65 |
| Dominique Colvard | 110 | 3.93 | 432.30 |
| Paul Brezik | 110 | 27.18 | 2,989.80 |
| Clyde Williams | 110 | 326.43 | 35,907.30 |
| Darren Rose | 100 | 4.68 | 468.00 |
| Kristen Dvorak | 90 | 19.50 | 1,755.00 |
| **Total:** | | | **$500,960.35** |

## B. Lodestar Adjustment

Next, the Court considers the *Johnson* factors not previously considered to determine whether an upward or downward adjustment of the lodestar is warranted.[26]

*See Saizan*, 448 F.3d at 800.  Kiva asserts the case was legally complex, requiring

---

[26]The Court notes that most of the *Johnson* factors were considered in determining the lodestar calculations.  Thus, the Court considers only the second, third, sixth, seventh, and eighth remaining factors in determining whether to adjust the lodestar calculation.

extensive legal research and briefing due to, *inter alia*, an absence of Fifth Circuit case law on the ACPA. However, the Court is not persuaded a lack of case law rendered the case complex because the parties and the Court had sufficient guidance from other courts regarding the ACPA. Moreover, although Defendants contested the burden of proof regarding damages, an issue not as clearly defined by existing case law, the other issues raised in the case were neither novel nor complex. Thus, the Court finds the novelty and difficulty of the issues and the skill required to properly perform legal services do not warrant an adjustment to the lodestar amount.

With respect to the factors regarding the nature of the fee and any time constraints, Burgert asserts some attorneys dedicated almost 100% of their time on the case during the trial term. However, Burgert acknowledges it only "had to postpone" working on other cases and does not assert the firm turned away any work or clients. The Court finds these factors do not warrant an adjustment to the lodestar.

Regarding the amount involved and the results obtained, Defendants argue Kiva's request for $711,000 in fees is unreasonable based upon the jury's actual damage award in the amount of $257,632. In deciding whether a fee is excessive, a court must consider whether the requested fees bear a reasonable relationship to the amount in controversy. *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345, 354 (5th Cir. 2001); *see also Hensley v. Eckerhart*, 461 U.S. 424, 436

(1983) (explaining that if a plaintiff achieves only partial or limited success, the hours expended in the litigation may be excessive, even if a plaintiff's claims were interrelated, non-frivolous, and raised in good faith).  However, disproportion between the amount of attorneys' fees sought and the damages recovered in the lawsuit does not alone render an award of attorneys' fees excessive. *Northwinds Abatement, Inc.,* 258 F.3d at 354-55 (upholding a district court's fee award that was more than nine times actual damages based upon, *inter alia,* the complexity of the case, and the defendants' failure to challenge the reasonableness of the fee amount).

In this case, Kiva prevailed on all of its claims submitted to the jury.  In it first amended pleading, Kiva sought either Defendants' profits or $800,000 for the eight domain names utilizing Kiva's trade names.  Conversely, Defendants did not prevail either in their defense of Kiva's claims or in their cross-claims against the Third-Party Defendants.  Although the jury awarded actual damages in the amount of $257,632, the Court awarded statutory damages in the amount of $500,000 under the ACPA. Therefore, the Court finds the lodestar calculation in the amount of $500,960.35 bears a reasonable relationship to the amount in controversy. *See Northwinds Abatement, Inc.,* 258 F.3d at 354; *Hensley,* 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation . . . ."). Based upon

the Court's analysis of the *Johnson* factors, the Court finds no adjustment of the lodestar calculation is warranted. *See Saizan*, 448 F.3d at 800. Thus, Kiva is entitled to recover attorneys fees in the amount of $500,960.35.

## C. Contingent Fees

Kiva seeks contingent fees in the amount of $200,000. Specifically, Kiva avers a contingent fee award in the amount of $125,000 in the event of an appeal to the Fifth Circuit is necessary based upon the legal issues likely to be presented. Furthermore, Kiva avers the Court should award at least an additional $75,000 in the event the case is appealed to the United States Supreme Court. However, the Court declines to award contingent fees in this case. *See Penton v. Am. Bankers Ins. Co. of Fla.*, 115 F. App'x 685, 686 (5th Cir. 2004) (explaining that when a court refuses to award attorneys' fees for an appeal before they are incurred, the appeals court remands to the district court once the claim for fees is ripe for adjudication); *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 433 (5th Cir. 2003) ("It is difficult to imagine how a district court's refusal to award appellate attorney fees before an appeal had even been taken could possibly be declared an error.").

## IV. Costs

Kiva requests $20,561.18 in taxable costs pursuant to Rule 54(d)(1) of the

Federal Rules of Civil Procedure. Specifically, Kiva requests: 1) fees of the Clerk in the amount of $350; 2) fees for service of summons and subpoena in the amount of $320; 3) fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case in the amount of $5,529.98; 4) fees for witnesses in the amount of $80; 5) docket fees under 28 U.S.C. § 1923 in the amount of $20; and 6) fees for exemplification and copies of papers necessarily obtained for use in the case in the amount of $14,261.20.

Federal Rule of Civil Procedure 54(d)(1) provides for an award of costs "to the prevailing party unless the court otherwise directs." FED. R. CIV. P. 54(d)(1). Furthermore, the Fifth Circuit strongly presumes that courts will award costs to the prevailing party. *Pacheco v. Mineta,* 448 F.3d 783, 793 (5th Cir. 2006). Defendants do not dispute Kiva is the prevailing party and thus, entitled to costs.

Title 28 U.S.C. § 1920 identifies recoverable costs:

A judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and copies of papers necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920 (2006) ("§ 1920"). A court may decline to award the costs listed

33

in the statute but may not award costs omitted from the list. *Gaddis v. United States,* 381 F.3d 444, 452 (5th Cir. 2004); *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445 (1987).

Before a court taxes a bill of costs, "the party claiming any item of cost or disbursement shall attach . . . an affidavit, . . . that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed." 28 U.S.C. § 1924 (2006). If a party does not set out costs with sufficient particularity, a court may disallow them. *See Davis v. Commercial Union Ins. Co.,* 892 F.2d 378, 385 (5th Cir. 1990). If the party being taxed does not specifically object to a cost, the presumption is that the costs being sought were necessarily incurred for use in the case and will be taxed. *Reyes v. Tex. Ezpawn, L.P.,* Civ. A. No. V-03-128, 2007 WL 4530533, at *1 (S.D. Tex. Dec. 19, 2007). However, a court must give "careful scrutiny" to the items proposed by the prevailing party. *Id.* (citing *Kellstrom,* 50 F.3d at 335).

Kiva included a request for costs in its motion for entry of judgment filed February 15, 2008 and supplemented its request, attaching relevant invoices on April 1, 2008. Burgert submits an affidavit in support of Kiva's request for attorneys' fees and costs asserting "Kiva reasonably and necessarily incurred the costs." Defendants do not object to the costs Kiva seeks.

34

After reviewing the record in detail, the Court finds filing fees in the amount of $350 are recoverable. *See* § 1920; *Condon v. Hunting Energy Servs. L.P.*, Civ. A. No. H-04-3411, 2006 WL 2882857, at *6 (S.D. Tex. Oct. 4, 2006) (awarding court filing fees). Moreover, the Court finds witness fees in the amount of $80 are recoverable.[27] *See* 28 U.S.C. § 1821(b) (2006) (authorizing witness fees of $40 per day); *Jensen v. Lawler*, 338 F. Supp. 2d 739, 746 (S.D. Tex. 2004) (taxing witness fees of $40 per day as authorized by § 1920). However, the Court must determine whether Kiva is entitled to the following costs: 1) fees for services of summons and subpoena; 2) fees of the court reporter; and 3) fees for exemplification and copies of papers necessarily obtained for use in the case.[28]

## A. Fees for service of summons and subpoena

Kiva seeks service of process fees in the amount of $320 and supports this request with two invoices from a private process server. However, private process server fees are not recoverable fees of the clerk and marshal under § 1920. *See Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 788 (S.D. Tex. 2007). Thus, the Court will deduct $320 from the request for costs.

---

[27]Kiva submits witness fees for Larry Campbell and David Weir, both of whom testified at trial.

[28]Although Kiva seeks docket fees in the amount of $20, it provides no support for this request. Thus, the Court declines to award docket fees. *See Davis*, 892 F.2d at 385.

35

### B. Fees of the Court Reporter

Kiva seeks fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case in the amount of $5,529.98. However, because Kiva submits invoices in the amount of $6,051.13 to support its request, the Court considers what amount of costs from the invoices are recoverable.[29]

### 1. *Trial Transcripts*

Kiva seeks costs for a trial transcript in the amount of $1,222.70.[30]   Trial transcript fees are recoverable upon a showing they were necessarily obtained for use in the case. *J.T. Gibbons, Inc.*, 760 F.2d at 616 (explaining that daily trial transcripts are taxable costs if the copies were necessary for use in the case). Kiva made excellent use of Davis' trial transcript during trial and in support of its motions for entry of judgment. Thus, the Court awards the cost of Davis' trial transcript in the amount of $1,222.70. *See Canion v. United States*, No. EP-93-CA-0347-FM, 2005 WL 2216881, at *3 (W.D. Tex. Sept. 9, 2005) (awarding cost of a trial transcript that counsel relied on to submit findings of fact and conclusions of law after a bench trial).

---

[29]Kiva does not explain the discrepancy between the invoice amount and the requested fee. Although the Court considers Kiva's request based upon the higher invoice fee, the Court awards fees of the court reporter that are less than the amount Kiva requested.

[30]Kiva requests the trial transcript of Davis' testimony at trial.

## 2. *Witness Depositions*

Kiva seeks costs of original depositions. The invoices include not only fees for an original and copy of a deposition but also other fees for, *inter alia*, videotaping of depositions, shipping and handling fees, and expedited rates. As the prevailing party, Kiva is entitled to recover the costs of original depositions provided they were necessarily obtained for use in the case. *See Fogleman v. ARAMCO*, 920 F.2d 278, 286 (5th Cir. 1991). A deposition does not need to be introduced into evidence at trial in order to be "necessarily obtained for use in the case." *Id.* at 285. If at the time it was taken, a deposition could reasonably be expected to be used for trial preparation, rather than merely for discovery, it may be included in the costs of the prevailing party. *Id.* Depositions used during trial or for trial preparation, not for mere convenience of counsel, may be included in taxable costs. *Id.*

However, numerous other costs in Kiva's invoices are not taxable costs. The Fifth Circuit has held that videotaping costs are not authorized by § 1920. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 529-30 (5th Cir. 2001). Other courts have excluded shipping fees and administrative fees. *See Canion*, 2005 WL 2216881, at *3 (excluding shipping and administrative fees because they are not authorized by statute). Furthermore, the extra cost of obtaining transcripts on an expedited basis is not taxable without prior court approval or special characteristic

37

of the litigation that necessitates expedited receipt of the transcript. *Fogleman*, 920 F.2d at 286.

Based upon the Court's review of the invoices and reducing fees charged for videotaping, shipping and handling, and expedited rates, the Court awards costs for the following witness depositions: Tolar Hamblen in the amount of $398.50; Larry Burns in the amount of $750.80; Larry Campbell in the amount of $92.38; Jennifer Tyrrell and Todd McCally in the amount of $1,299.35; and John Michael Davis in the amount of $1,143.20 for a total witness deposition fee award in the amount of $3,684.23. Thus, the Court awards total fees of the court reporter for trial transcripts and witness deposition transcripts in the amount of $4,906.93.

## C. Fees for Exemplification and Copies of Papers

Kiva seeks printing costs in the amount of $14,261.20 and presents the Court with invoices for such copying. In his affidavit, Burgert avers he reduced the original cost of $19,014.94 by twenty-five percent to account for reproduction and printing costs attributable to attorney correspondence and documents printed for the convenience of the attorneys and paralegals. Because Kiva attached invoices that reflect a total printing cost in the amount of $11,727.85, the Court considers only whether Kiva is entitled to printing costs based upon the invoices submitted.

The cost of copying documents is taxable provided the prevailing party

demonstrates they are necessarily obtained for use in the case. *Fogleman*, 920 F.2d at 286. Relevant documents and exhibits for use in the case are taxable, but multiple copies of documents and attorney correspondence are not taxable. *Id.*; *Roehrs v. Conesys, Inc.*, Civ. A. No. 3:05-CV-829-M(BH), 2008 WL 755187, at *2 (N.D. Tex. Mar. 21, 2008). Courts have noted that § 1920 does not list converting paper documents into an electric format as a taxable cost. *See Roehrs*, 2008 WL 755187, at *3 (denying costs associated with creating digital versions of documents because they were merely more convenient for counsel); *Auto Wax Co., Inc. v. Mark V Prods., Inc.*, No. Civ. A. 3:99-CV-0982-M, 2002 WL 265091, at *6 (N.D. Tex. Feb. 22, 2002) ("Most courts have reasoned that minuscripts and disc copies are only for the convenience of attorneys. Disc copies, in particular, are disfavored.").

In the case at bar, most of the invoices Kiva submitted for printing services were dated within about thirty days of trial, indicating the costs were incurred for Kiva's presentation of its case. However, Kiva's invoices included costs to obtain digital discs that are not taxable costs. After reducing the invoices for impermissible costs, the Court awards fees for exemplification and copies of papers in the amount of $11,206.56. Accordingly, the Court awards taxable costs as follows: $350 for fees of the clerk; $4,906.93 for fees of the court reporter; $80 for witness fees; and $11,206.56 for exemplification and copies of papers. Thus, the Court finds Kiva is

39

entitled to costs in the amount of $16,543.49.

In sum, Kiva is entitled to statutory damage in the amount of $500,000 for Defendants' violation of the ACPA, attorneys' fees in the amount of $500,960.35, and costs in the amount of $16,543.49, for a total damage award in the amount of $1,017,503.70.[31]

## V. INJUNCTION

Kiva seeks a permanent injunction enjoining Defendants from: 1) infringing on Kiva's trade names and marks, including Jarrell Appliance Gallery, AABC Appliance Gallery, Stone Appliance Gallery, and McNairs Appliance Gallery; and 2) using Kiva's trade names and marks in connection with the promotion, advertising, offering, manufacturing, distributing, or selling of Capital's and/or Davis's products and services.

The Lanham Act provides that "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem

---

[31]Kiva seeks to hold Capital and Davis joint and severally liable for damages assessed against them. Corporate officers and the corporation may be liable for trademark infringement. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 258, 264 (9th Cir. 1996); *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19, 23 (5th Cir. 1968). Because the jury found both Capital and Davis infringed the eight domain names, the Court finds Defendants are joint and severally liable to Kiva for the total damage award.

reasonable . . . ." 15 U.S.C. § 1116(a) (2006). A decision to grant or deny permanent injunctive relief rests within the equitable discretion of a district court and should be decided according to traditional principles of equity. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). However, in granting an injunction, a court must comply with Federal Rule of Civil Procedure 65(d) by setting forth its reasons for issuing the injunction and describing its parameters in reasonable detail. *See* FED. R. CIV. P. 65(d); *see also Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Ltd.*, 90 F. App'x 543, 548 (Fed. Cir. 2004). Thus, the Court must determine whether an injunction is warranted.

Under well-established equitable principles, in order to obtain a permanent injunction, a plaintiff must establish that: (1) he or she will suffer irreparable injury absent the injunction; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc.*, 547 U.S. at 391 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982)).

Neither party specifically addresses whether Kiva meets the four-factor test for a permanent injunction. Nonetheless, courts recognize that "injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no

adequate remedy at law for the injury caused by an infringer's continuing infringement." *Audi AG*, 469 F.3d at 550-51 (citing *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988)).

In this case, Davis registered and controlled Kiva's trade names as domain names and forwarded the Jarrell domain names to Capital's website. After Capital returns the infringing domain names, Kiva faces a potential for future harm because numerous other variations of Kiva's trade names could be extrapolated into other infringing domain names. Given Davis' registration of numerous variations of competitor's names and the relatively unfettered ability to register infringing domain names, the Court finds Kiva suffers irreparable injury and has no adequate remedy at law. Kiva faces the potential of future harm that consumers seeking Kiva's website may be directed to Capital's website. *See id.* at 550 (explaining that so long as the infringing domain name stayed online, there was a potential for future harm, and therefore, no adequate remedy at law); *E. & J. Gallo Winery*, 286 F.3d at 280 (explaining that in cybersquatter cases, there is a high likelihood of consumer confusion—reasonably prudent consumers would believe the site using the appropriated name is the trademark owner's official site).

Moreover, although Kiva and Capital do not sell products on their websites, consumers and builders use the companies' websites to search for products they sell.

It is in the public interest to issue an injunction to prevent these consumers from being misled. *See Audi AG*, 469 F.3d at 550. Defendants do not face a hardship in refraining from registering its competitors' trade names as domain names. *See id.* Thus, the Court finds an injunction is warranted. Defendants are enjoined from registering or using Kiva's trade names alone or in conjunction with any other terms. *See id.* (affirming a district court's injunction in favor of plaintiff when the defendant attempted to use plaintiff's marks and profit from plaintiff's good will); *E. & J. Gallo Winery*, 286 F.3d at 280 (affirming a district court's enjoining defendants from registering or using an internet domain name containing the plaintiff's trade names).

## VI. PRE- AND POST-JUDGMENT INTEREST

Kiva seeks pre-judgment interest. However, an award of pre-judgment interest is not available on a statutory damage award. *Granville v. Suckafree Records, Inc.*, No. Civ. A. H-03-3002, 2006 WL 2520909, at *6 (S.D. Tex. June 28, 2006); *Blackmer v. Monarch Holdings (USA), Inc.*, No. Civ. A. H-00-4290, 2002 WL 32361935, at *5 (S.D. Tex. July 11, 2002). However, the Court finds an award of post-judgment interest under the ACPA is appropriate. *See E. & J. Gallo Winery*, 286 F.3d at 281 (affirming a district court's award of post-judgment interest for violations of the ACPA). Kiva is entitled to recover post-judgment interest on the statutory damages and attorneys' fee award at the rate of 1.63%. *See Blackmer*, 2002 WL

32361935, at *5 (awarding post-judgment interest on the judgment and attorneys' fee award). Accordingly, the Court hereby

ORDERS that Plaintiff Kiva Kitchen & Bath, Inc.'s Motion for Assessment of Statutory Damages Under the Anti-Cybersquatting Consumer Protection Act (Document No. 147) is GRANTED. Plaintiff Kiva Kitchen & Bath, Inc. shall recover from Defendants Capital Distributing, Inc. and John Michael Davis, joint and severally, statutory damages in the amount of $500,000. The Court further

ORDERS that Plaintiff Kiva Kitchen & Bath, Inc.'s Motion for Judgment Subject to its Motion for Assessment of Statutory Damages under the ACPA (Document No. 148) is GRANTED IN PART and DENIED IN PART. Plaintiff Kiva Kitchen & Bath, Inc. shall recover from Defendants Capital Distributing, Inc. and John Michael Davis, joint and severally, attorneys fees in the amount of $500,960.35. The Court further

ORDERS that Plaintiff Kiva Kitchen & Bath, Inc. shall recover from Defendants Capital Distributing, Inc. and John Michael Davis, joint and severally, costs in the amount of $16,543.49. The Court further

ORDERS that Defendants Capital Distributing, Inc. and John Michael Davis are enjoined from infringing on Plaintiff Kiva Kitchen & Bath, Inc.'s trade names and marks, including Jarrell Appliance Gallery, AABC Appliance Gallery, Stone

Appliance Gallery, and McNairs Appliance Gallery in connection with the promotion, advertising, offering, manufacturing, distributing, or selling of Capital's and/or Davis' products and services.  The Court further

ORDERS that Defendants' Response to Plaintiff's Motion for Judgment and Motion for Judgment (Document No. 151) is DENIED.  The Court further

ORDERS that Defendants' Proposed Final Judgment (Document No. 154) is DENIED.  The Court further

ORDERS that Defendants/Third-Party Defendants BringMeBiz, Inc. and Todd McCally's Motion for Judgment and Response to Defendants' Motion for Judgment (Document No. 160) is GRANTED.  Defendants Capital Distributing, Inc. and John Michael Davis shall take nothing from Defendants/Third-Party Defendants BringMeBiz, Inc. and Todd McCally.  The Court further

ORDERS that Plaintiff Kiva Kitchen & Bath, Inc.'s Brief in Support of Its Bill of Costs (Document No. 162) is GRANTED as indicated above.  The Court further

ORDERS that Plaintiff Kiva Kitchen & Bath, Inc. shall recover from Defendants Capital Distributing, Inc. and John Michael Davis, joint and severally, post-judgment interest at the rate of 1.63%.  The Court further

ORDERS that all other relief not expressly granted herein is DENIED.

SIGNED at Houston, Texas, on this **22** day of April, 2008.

DAVID HITTNER
United States District Judg